Filed 5/30/13  In re J.K. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J. K., a Person Coming Under the Juvenile Court Law. | B244297 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK77075) |
| Plaintiff and Respondent, | |
| v. | |
| JAMES K., | |
| Defendant and Appellant. | |

　　　　　APPEAL from orders of the Superior Court of Los Angeles County, Margaret S. Henry, Judge.  Affirmed.

　　　　　Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　　John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

―――――――――――――

INTRODUCTION

James K, father of 9-year-old J. K., appeals from the orders of the juvenile court denying his petition for modification (Welf. & Inst. Code, § 388)[1] and terminating his parental rights (§ 366.26). We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The section 300 petition*

In May 2009, when J. was four years old, her 22-year-old sister C. took her to the hospital to be examined after J. announced she did not want to return to James's house because he put his "thingy in her mouth, booty . . . he attempted to put his penis in her vagina." During this time, the child's mother was hospitalized from a stroke that left her unable to speak[2] and J. had been visiting C. The Department of Children and Family Services (the Department) detained J. and placed her with C.

Early in the dependency, J. did not want to see James during visits, explaining she was still James's " 'friend,' " but she would cease to be if he " 'does that again.' " James's conduct during visits appeared to make J. "nervous," "stiff," and "rigid," and the monitor was obliged to redirect his behavior. Unsolicited, J. volunteered to the children's social worker that she liked visiting with James and loved him, and " 'he only does that at night time.' " Asked what she meant, J. responded, " 'he touched my cuca.' " She added, " 'he didn't want to do it, but he did.' "

The juvenile court sustained a petition alleging James sexually abused J. and mother was unable to provide care and supervision for the child because of health problems. (§ 300, subds. (b) & (d).) The court ordered James to complete a parenting education course and individual counseling with a licensed therapist to address sexual abuse. The court awarded James monitored visits. Four months later, the court added a sexual abuse treatment program to James's case plan. The Department placed J. with her maternal aunt, Rochelle T., in mid-2009.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Mother, Latrice T. died on September 20, 2010 and is not a party to this appeal.

2

2. *The reunification period*

By the six-month review hearing (§ 366.21, subd. (e)), James had completed a parenting education program. A year into the dependency (§ 366.21, subd. (f)), James stopped attending counseling after completing only 17 sessions. During that year, James was reportedly compliant with attendance and participation in therapy. He expressed an understanding of the legal, social, and psychological consequences of sexual abuse and believed sexual abuse was unacceptable and problematic. He stated he did not intend to touch J. in a sexual manner and understood his role as a father. Nevertheless, his therapist was concerned about James's lack of appropriate boundaries with women. James made inappropriate comments of a sexual nature to both his therapist and the children's social worker, and he engaged in sexual behavior with mother while she was hospitalized and unable to speak or function normally. Hence, the therapist declined to make any recommendation about James's visitation with, or custody of, J.

As for visits, James displayed both appropriate behavior and inappropriate physical boundaries. For example, James sat J. in the crotch area of his lap and engaged in excessive petting, stroking her buttocks, and attempting to lick her neck. Although he complied when the monitor asked him to refrain from this behavior, he told J. that the reason was that " '*they won't let you*.' " (Italics added.) In the social worker's view, James had no insight about what constituted appropriate physical boundaries. He claimed that licking J.'s neck was " 'just a game we play.' "

James continued to engage in inappropriate behavior during visits nine months into the dependency. J. was sometimes relaxed and sometimes stiff around him. James did not understand why it was inappropriate to have J. hang onto him and stand between his legs. Fourteen months into the dependency, Rochelle reported that J. acted out at times because she did not want to go home with James. Eighteen months into the dependency, J. told the social worker she liked visiting James but would like to remain living with Rochelle where she was happy.

In advance of the 18-month review hearing (§ 366.22), James announced he did not need to do anything else to get his daughter back. He claimed he had done

3

"everything" he was supposed to do, did not want to go to any more therapy, and did not need to participate in substance abuse counseling. He failed to acknowledge J.'s sex abuse allegations and did not see that there was a problem with his having fondled his paralyzed wife during his visits with her in the hospital. Between May 2010, when he ceased therapy, and October 30, 2010, the 18-month mark, James contacted his therapist on only three occasions. For these reasons, the Department opined there remained a substantial risk if J. were returned to James' custody.

James' therapist repeated her earlier concerns about James's inappropriate boundaries with women. Asked about James's ability to interact appropriately with J., his therapist responded only that she would *like to see James continue therapy and learn appropriate play with J.* Although the therapist had recommended conjoint therapy for J. and James, she opined that such therapy should be postponed as the child's mother had recently passed away.

At the 18-month review hearing, the juvenile court ordered the Department to initiate an adoptive home study, terminated reunification services, and set the permanent plan review hearing (§ 366.26).

3. *Post reunification*

J. was doing well and appeared happy with Rochelle, who wanted to adopt the child. J. and Rochelle were bonded and Rochelle treated J. like her own child. Rochelle met J.'s needs and gave her unconditional love and provided a nurturing environment. The child had completed her psychotherapy. She enjoyed visits with James and displayed no indication of fear.

James was upset that J. had been placed with Rochelle as he and Rochelle do not get along. James attended a total of 29 counseling sessions in 18 months. His participation in therapy was intermittent because of finances, but he kept in contact with his counselor and could resume therapy if he had to. Although James was willing to develop sexual boundaries, his therapist could not recommend J. be returned to James's custody as James's past behaviors had not "been fully cleared." The therapist indicated

that James had very poor impulse control and so the therapist doubted James had actually learned skills in his parenting program.

4. *James's section 388 petition*

In May 2012, three years after J. was detained, James filed a section 388 petition requesting that J. be returned to his custody or that he be given additional reunification services. He alleged he had attended 44 individual therapy sessions and had "learned the importance of healthy boundaries with J. and [] am able to put these skills into practice." The proposed modification would be in J.'s best interest, he asserted, because she would benefit from an ongoing relationship with him as he had been visiting every week and the two shared a strong bond. He attached an undated letter from his therapist "in support of [James's] petition for his daughter . . . *to be placed in [a] guardianship with a responsible adult*, rather than go through the process of adoption." (Italics added.) The therapist reported that James had taken breaks from therapy but has "*indicated* engagement in all themes discussed" during therapy. (Italics added.) James reportedly expressed an understanding of how sexual abuse damaged children and the ways it contributed to problems in families and society. The therapist stated that James showed a sense of responsibility toward his children and appeared to be able to continue to be respectful and dedicated to all of them. The therapist explained she witnessed more than one telephone call between James and J. that seemed unplanned and unrehearsed, during which J. expressed appropriate affection and trust. The therapist explained that "[d]uring this time[, James's] past behaviors have not been fully clear to me, and for that reason I have not been fully prepared to advocate for him to be granted full custody of J."

At the combined section 388 and section 366.26 hearing held in September 2012, James' therapist testified that James had learned what the boundaries were. James had become more open about his childhood and relationships with his family and had worked on his anger and impulse control. The therapist had never met J. but had heard the child, over the telephone, ask James when she was going to see him. The therapist opined that James and J. had a healthy, trusting relationship and that he would respect her. The

5

therapist felt *James would benefit* from conjoint therapy with J. because such therapy would facilitate conversations about the abuse in a monitored setting.

The juvenile court denied James's section 388 petition on the ground, although James and J. loved each other, that it was in her best interest to have permanence with the person who had become her mother and had been her stability for three years.

Turning to the permanent planning hearing, the court found J. was likely to be adopted and no exception to adoption applied. Although there was a benefit to J.'s continued relationship with James, the benefit really inured to James rather than to J. The court found the benefit to J. of their relationship did not outweigh the benefit of permanence that adoption would give her. The court terminated parental rights and James filed his appeal.

DISCUSSION

1. *The juvenile court did not abuse its discretion in denying James's section 388 petition.*

"Under section 388, a parent may petition the court to change, modify, or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, that [(1)] there is a change of circumstances or new evidence, and [(2)] the proposed modification is in the minor's best interests. [Citations.]" (*In re S.M.* (2004) 118 Cal.App.4th 1108, 1119.) "It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) A petition under section 388 is addressed to the juvenile court's sound discretion and on appeal we will disturb the decision only on a clear showing of abuse of that discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

Apart from whether he has shown a change of circumstances, James has not demonstrated the second prong of the section 388 test, namely how returning J. to his care or granting him additional reunification services would be in the child's best interest. Among the factors juvenile courts consider in determining whether a proposed change of

6

order is in the children's best interest are: (1) "the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem;" (2) "the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been," and (3) "the strength of relative bonds between the dependent children to *both* parent and caretakers." (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532.)

Turning to the first and second factors (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532), manifestly sexual abuse, the cause of this dependency, is an extremely serious problem. The problem has not been ameliorated in the three years of this dependency. James has only intermittently attended therapy, with the result his own therapist's letters in support of James' section 388 petition *did not recommend J. be returned to James's custody*. The only recommendation was conjoint counseling in a monitored setting because it would *benefit James*, signaling that the therapist does not believe this problem has been removed or ameliorated.

The third factor, "the strength of relative bonds between the dependent children to *both* parent and caretakers" (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532), does not favor James. Although J. and he have a close relationship, with Rochelle, the child is happy and doing well. J. has been with Rochelle for nearly half of the child's life, receives unconditional love, and is no longer in need of psychotherapy. James has not demonstrated that it would be in J.'s best interest to return her to his custody.

Nor has he demonstrated that it would be in J.'s best interest to grant James additional reunification services, the alternative order he requested in his section 388 petition. "After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability. [Citation.]" (*In re Angel B*. (2002) 97 Cal.App.4th 454, 464.) "[O]n the eve of the section 366.26 permanency planning hearing - the children's interest in stability was the court's foremost concern and outweighed any interest in reunification. [Citation.]" (*In re Edward H*. (1996) 43 Cal.App.4th 584, 594.) "In fact, there is a rebuttable presumption that continued foster care is in the best interest of the child [citation]; such presumption

7

obviously applies with even greater strength when the permanent plan is adoption rather than foster care. A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, what is in the best interest of the child. [Citation.]" (*In re Angel B*., *supra*, at p. 464.) Where J. has been with Rochelle for nearly half of her life, and where James has neither complied with his case plan during the reunification period, nor addressed the cause of the dependency in therapy, the prospect of an additional reunification period simply would not have promoted stability for J. and therefore would not be in her best interest.

James argues that because Rochelle does not want to maintain contact with James, it is unlikely that J.'s relationship with him will survive. Yet, as noted, the focus at this stage is on what is in *J.'s* best interest, not what is in James's interest. The juvenile court did not err.

2. *The evidence supports the juvenile court's finding that the parental-relationship exception to adoption did not apply.*

At the permanency planning hearing, the juvenile court must order one of three dispositional alternatives: adoption, guardianship, or long-term foster care. (*In re S.B*. (2008) 164 Cal.App.4th 289, 296-297.) The Legislature has declared a strong preference for adoption over the alternative plans if the dependent child is adoptable. (*Id.* at p. 297.) Thus, the statute directs, if the court finds that the child is adoptable, "the court *shall* terminate parental rights unless" the court "finds a compelling reason for determining that termination would be detrimental to the child due to" one of the six delineated exceptions. (§ 366.26, subd. (c)(1) & (c)(1)(B), italics added.) Only if a compelling reason for applying an exception appears may the court select a plan other than adoption.

The exception to adoption on which James relies is that found in section 366.26, subdivision (c)(1)(B)(i), the so-called parental-relationship exception. This exception applies when the court finds that (1) "[t]he parents have maintained regular visitation and contact with the child and [(2)] the child would benefit from continuing the relationship."

8

(§ 366.26, subd. (c)(1)(B)(i).) As the parent, James bears the burden to show application of this exception. (*In re Megan S*. (2002) 104 Cal.App.4th 247, 251.)

"A beneficial relationship is one that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.]" (*In re Amber M*. (2002) 103 Cal.App.4th 681, 689.) The existence of this beneficial parental relationship "is determined by '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs . . . .' [Citation.]" (*In re Jerome D*. (2000) 84 Cal.App.4th 1200, 1206.)

In applying the exception, courts "balance[] the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child." (*In re B.D*. (2008) 159 Cal.App.4th 1218, 1234-1235.) "[I]f severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.] In other words, if an adoptable child will not suffer *great detriment* by terminating parental rights, the court must select adoption as the permanency plan. [Citation.]" (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 229, italics added.)

The precise standard of review applicable to an appeal of a juvenile court ruling concerning this exception to adoption is in some dispute. (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314, citing *In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1351.) The *Bailey J*. court concluded both the sufficiency-of-the-evidence and the abuse-of-discretion standards apply. (*In re Bailey J*., *supra*, at pp. 1314-1315.) The substantial evidence standard of review applies to the question of whether a beneficial parental relationship exists. (*Id*. at p. 1314.) "[A] challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.]" (*Ibid.*, quoting from *In re I.W*. (2009) 180 Cal.App.4th 1517, 1529.)

The parental-relationship exception to adoption also requires the court to determine whether the parental relationship constitutes a "compelling reason for determining that termination [of parental rights] would be detrimental." (§ 366.26, subd. (c)(1)(B).) That assessment is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

Applying these principles here, although James did have regular and ongoing visitation with J., the juvenile court did not abuse its discretion in determining that the relationship James had with J. was not so beneficial to the child that she would suffer a great detriment by terminating James's parental rights. First, the evidence supports the court's findings that James never advanced to unsupervised visits, meaning J. was never deemed safe in his care. His therapist, who never met J., did not recommend that James have custody of the child. Second, J. has been living with Rochelle for almost as long as she had lived with James. During the time J. was in James' custody, he sexually abused her. Indeed, he continued to engage in inappropriate behavior with J. even during the reunification period. Although J. enjoyed her visits with James, she was also periodically uncomfortable. James appeared to have no insight into why his behavior was inappropriate even while he reportedly claimed to understand how sexual abuse damaged children and contributed to problems in families and society. Meanwhile, as noted, J. is bonded with Rochelle and has clearly expressed a preference for remaining with her aunt. The child's needs are being met and Rochelle is nurturing to such an extent that J. no longer requires psychotherapy. For the foregoing reasons, the juvenile court did not abuse its discretion in ruling that James' relationship with J. does not benefit the child sufficiently to outweigh the strong preference for adoption and the permanence and stability it provides.

James argues the impact on J. of this ruling is unknown and so it cannot be said that it is substantially outweighed by the permanence of adoption. He then surmises that J. will be irreparably harmed if she never saw him again. As the parent James had the burden to show that J. would benefit from continuing a relationship with him. (*In re Megan S.*, *supra*, 104 Cal.App.4th at p. 251.) He does not carry this burden by arguing the impact on J. is *unknown*. In any event, "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) Yet, "[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.]" (*In re Angel B*., *supra*, 97 Cal.App.4th at p. 466.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D*., *supra*, 78 Cal.App.4th at p. 1350.) James has not demonstrated that this is such a case. J. and James have a connection. However, the therapist's letter supports the juvenile court's conclusion that James would be the one to benefit from continued contact. In short, James has not demonstrated that his relationship with the child is sufficiently positive to outweigh the benefit J. derives from the permanence and stability of adoption.[3]

DISPOSITION

---

[3] The cases James relies on are distinguished. The psychologist in *In re Amber M*., *supra*, 103 Cal.App.4th 681, who conducted a bonding study of the mother and children concluded they shared " 'a primary attachment' and a 'primary maternal relationship' and that '[i]t could be detrimental' to sever that relationship." (*Id*. at p. 689.) Not only is this record lacking in evidence that James and J. shared such a strong bond, but James' own therapist has never recommended that he regain custody of J. In *In re S.B.*, *supra*, 164 Cal.App.4th 289, the record showed "[w]hen S.B. was removed from his care, [the father] immediately recognized that his drug use was untenable, started services, maintained his sobriety, sought medical and psychological services, and maintained consistent and regular visitation with S.B. He complied with 'every aspect' of his case plan." (*Id*. at p. 298.) The father " 'consistently puts his daughter[']s needs and safety before his own.' " (*Ibid*.) By contrast, James has yet to recognize J.'s allegations and his problem with sexual boundaries.

The orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:




KLEIN, P. J.




CROSKEY, J.